Next case is BlueCatBio MA v. Yantai AusBio Laboratories, 2022, 1450. Mr. Willie, when you are ready. Is it Willie? Is it Willie? Did I pronounce your name correctly? Michael Rader. Oh, sorry. Oh, sorry. I'm looking at the next one. Not even close. Thank you, Your Honor. May I proceed? Please proceed. Thank you, Your Honors, and may it please the Court. My name is Michael Rader from Wolf Greenfield on behalf of the appellant BlueCatBio. I'd like to focus my argument time today on two aspects of the claim construction issue before Your Honors.  I'd like to start with the file history because it presents an unusually compelling set of facts and errors by the Board. We're here because in the final written decision, the Board found that the gyro washer, the prior art from the petition, did not practice the wind limitation of these claims because there was some liquid left behind, and in particular, there were drops, according to the patent owner's expert, that fell from the inner surface of the housing back onto the microplates. So, in other words, the Board agreed with AusBio that the wind limitation excludes this phenomenon of drops dripping back onto the microplates. That dripping phenomenon is exactly what the examiner found the claims on the wind limitation do cover. So the Board reached a claim construction that was the exact diametric opposite of that of the examiner during prosecution. So this led to three separate, somewhat related, legal errors. The first is that by crediting AusBio's argument to the examiner, the Board was effectively applying the canon or the doctrine of prosecution as to a disclaimer. An applicant's narrowing argument for narrow claim construction is relevant when it works, a prosecution history disclaimer. But this Court has been clear that when the examiner expressly disagrees and rejects that narrow construction, the doctrine of prosecution history disclaimer does not apply. This effectively neutralizes any potential effect that the applicant's narrowing claim construction argument otherwise could have had. Let me just ask this. So we've made clear in a number of cases, like, what is it, personalized communication, and a number of cases that, in fact, prosecution history, including narrowing, can have a very important effect. Even when it's not a disclaimer or disavowal that's working against what one would otherwise conclude from the claim language or the specification, it can, in fact, resolve a potential uncertainty that one would have before getting to the prosecution history. And I guess I took the district court here to be saying, in effect, it at least – are we on district court? It's the board. The board, sorry. The next case is the district court. At least saying that the prosecution history here powerfully supports one available view, available from the text and the spec. So I think Your Honor is referring to the separate line of cases that says an argument or a statement made during prosecution, even if it fails to meet the threshold of a clear and unmistakable surrender of subject matter, surrender of claim scope that's required for prosecution history disclaimer, it can nevertheless, quote, unquote, inform the proper claim construction. Well, what we have here is an examiner expressly disagreeing and rejecting that construction. We know that in the context of prosecution history disclaimer, in both Echolab and Galderma, this court explained that the examiner's contrary view neutralizes what the applicant said. And Alice Bile has not cited, and I'm not aware of any case under the informing the claim construction doctrine that Your Honor is talking about, in which this court has ever held that the examiner expressing a contrary view would do anything but neutralize the effect of the applicant's narrowing statement either. But when you say neutralize, you mean we can't consider it, or the board can't consider it at all, as helping the patent owner's proposed construction? That's what this court expressly said in Echolab and Galderma with respect to prosecution history disclaimer. And I'm not aware of any decision from this court reaching a different conclusion under the less often applied but existing doctrine of informing claim construction that Judge Taranto raised. The district court committed a second error here, though, which is that It's the board. Sorry. Now I made the point. We're not anxious to get to the next case, I understand. The board made a second error here, which is that in addition to neutralizing the applicant's narrowing argument, under the St. Clair case, the examiner's view of the claim construction itself has independent affirmative significance because the examiner is considered to be one of ordinary skill in the art. We all know that the patent office is organized into art units. And so the person examining that patent application is considered to have that background. And therefore, as this court said in St. Clair, the examiner's view of claim construction, quote, carries significant weight, unquote. This makes sense, Your Honors, because the in-bank court in the Phillips case explained that the reason we look to the prosecution history in the first place is for evidence of how both the PTO and the applicant understood the claim language in question. But look, we're talking about the meaning of all or nearly all, right? That's the board's construction. And when you look at the patent, the patent supports that. It is possible to withdraw completely all liquid contained in the reaction vessel. In other words, it's possible, but not necessarily. And a little further up, it talks about the main part. And so the specification supports that it isn't necessarily all. And that's where I'd like to go next, Your Honor, because it's really important to look at those three embodiments that the parties have been talking about here. There's the so-called reversal embodiment, which is the embodiment at the top of column 13 where the patent says, after you run the centrifuge in one direction, which is what the independent claims here cover, there will be liquid left behind, which is, quote, preferably, unquote, removed. Why is it preferably removed? Because it's problematic, it's undesirable. They admit that on page 37 of the red brief. Why is it undesirable? As they admit on page 3 of the red brief, it's undesirable because remaining liquid causes or can cause cross-contamination. The board's construction was entirely aimed at supposedly avoiding cross-contamination. Yet that embodiment, and I'm going to get to the other two in a moment, that embodiment clearly leaves behind liquid that causes cross-contamination. And therefore it's excluded by the board's construction, at least as the board applied it. The board's construction was a bit of an onion. The first layer was the main part. That was in the institution decision. Then they said, we're construing the construction of main parts to mean all or nearly all. But what does that mean? So they said, well, all or nearly all means that you avoid cross-contamination. And that all came from Alice Bio's expert. That construction, as applied to the gyro washer, would then exclude that so-called reversing embodiment in column 13. And it would also exclude the aspiration pump embodiment in the middle of column 3 that Judge Lurie, that you were just mentioning. Because that embodiment also says, after you run the centrifuge in one direction, which again is what claims 1 and 12 cover, there will be residual liquid that can be removed manually. Now why would you need to remove it manually between uses? Because, as Alice Bio admits in its red brief at 38, it is undesirable liquid. Why is it undesirable? Because as they admit on page 3 of their red brief, it causes cross-contamination. Let me stop you. Doesn't all of this, including what Judge Lurie cited to suggest, that the patentee envisioned there would be very little water left, and your construction is so broad it could allow almost all of the water to be left. Isn't that the problem for you? Well, I think the issue here, Your Honor, is that the claim construction should cover, as ours does, all of the embodiments. They chose to write the... I understand that argument, but what about the response to my question? Isn't yours broad enough that it would include embodiments where perhaps almost all of the water is left? And that's clearly not what's going on here in the patentee's mind. It absolutely would cover that. There's no doctrine of claim construction that says the proper construction needs to be tailored only to the embodiments disclosed in the specification. In fact, the opposite. What about the fundamental doctrine that one of ordinary skill in the art looking at the patent and looking at the term that we're concerned with would not think there'd be a lot of water left, and yet your construction allows a lot of water to be left? Well, again, the issue is what's the problem with the water being left? Potentially cross-contamination. And not only did the examiner find that the claim limitation here embraces cross-contamination, if you look at the top of column 8 of this patent, it specifically talks about this dripping phenomenon and water being left behind. And it says the way to avoid this is not through this wind. The way to avoid this is by turning the microplate over first, shaking out most of the water, and then spinning it with only a little bit of the water left. So the patent itself, on the top of column 8, identifies and recognizes that this invention will not cause most of the water or the liquid to be withdrawn from the housing. Can I say just something completely different? Sure. Indefiniteness. I only saw, I think, one paragraph with a couple of sentences that don't really say anything. Did you really preserve this argument at the board? Yes, we made the same argument to the board that we're making now. We cited the fact that the construction itself that the board adopted, that Atos Bio had proffered below, now that the board has adopted, offers no objective standard by which to determine how much liquid is necessary. They say, well, it has to avoid cross-contamination. I understand the argument, but was it anything more than the two paragraphs that are referenced in your briefing here? Well, it addressed all the same things that we argue here. All we did here was we cited a couple more cases and used a few more words, but it focused, for example, on the testimony of their expert, Dr. Nissen, who was their cross-contamination expert. We focused on that testimony and then focused on it again here, where he says, even one drop of liquid left behind is too much. It will be excluded from the claim. But then he said, well, maybe a film of liquid, but not a drop of liquid, could be sufficient. But then when asked, by the way, the patent never tells you what the difference is between a film and a drop, then when asked about it, he said, well, he couldn't tell you whether a film would or would not be sufficient to take the device outside the scope of the claim. When asked whether the risk of cross-contamination has to be reduced to zero, he refused to answer that question. It was asked at least 10 times. He refused to answer it. And then he said the risk of cross-contamination has to be, quote, greatly reduced. And when he was asked what that meant, he had no answer for that. He couldn't say what that meant. We argued all of that, Your Honor, below to the board, and then we argued it again here. I see I'm into my rebuttal time. You can save it. We will save it for you. Thank you, Your Honor. Mr. Shapiro. Good morning, Your Honors. May it please the Court. I'm Jason Shapiro. I represent Pelley House BioLaboratories, the entire House BioLaboratories. Lookout Bio's counsel made a lot of allegations about the board's construction being wrong. And one of the things he said was that the board's decision is wrong here because it was applying disclaimer. And I'd like to point out that in the final written decision, the board was very careful to indicate that it was not. It was not applying disclaimer or surrender. And in fact, that term, the idea of surrender or disclaimer, was actually brought up by Blue Cat Bio. And the board said there is no disclaimer here in his final written decision. And yet on appeal, Blue Cat Bio is now turning around and said, well, the board made a mistake. They said that there's disclaimer. There was no disclaimer. If you look, for example, at Appendix 25, which is the board's final written decision, it expressly states we didn't find disclaimer here. We were just looking at the prosecution history to see if it was consistent with the claim construction that we've arrived at. And they did look at the prosecution history. They looked at the interaction between the applicant and the examiner. And they saw that the applicant was making the same arguments that it was making before the board in the PGR. And that during the patent prosecution, it didn't change its arguments. It didn't back off. It didn't disclaim. It didn't disclaim anything. So that's really a red herring. The other thing that opposing counsel brought up is that the fact that the applicant raised this argument and was unsuccessful in convincing the examiner that it was the case, and then found another way to get the claim allowed that had nothing to do with that argument, was somehow means that the board then couldn't agree that the applicant was right during patent prosecution. In other words, what Blue Cap Files counsel is arguing is that the board is bound by the examiner's position, which is ridiculous. And they cited to Ecolab and said, well, that's what Ecolab says. Well, Ecolab doesn't say anything of the sort. It was a disclaimer case. And what Ecolab said was, well, we looked at this and they recognized their error, and they didn't repeat it, and their statements are not clear and it's unmistakable enough to invoke the doctrine of prosecution history disclaimer. And again, the board is not relying on disclaimer. This is something Blue Cap File brought up during the proceeding. So again, it doesn't seem relevant here. Do you cite any cases where we've said, in that type of context, it's okay to nonetheless consider that whole back and forth during examination, and while it doesn't rise to the level of disclaimer, it can inform the proper construction? Have we said that? Because your friend seems to say we haven't said that. Well, I don't have a case directly on point. But we did cite a case that I think is broad enough to stand for that proposition, Phillips, which says that you should look at the prosecution history to see how the applicant understood its invention. And from day one, the applicant has said, because of this wind that's generated by the gap that you have in the claim, we can remove the liquid from the inner housing of this centrifuge and avoid contamination. And that's been from day one. It was during prosecution, it was during the PGR, and now it's on appeal. Al's File has not changed its position. That is how it has always construed the claim. And Phillips says that that's okay. You should actually look at the patent prosecution to see how the applicant understood the inventor. Who best to understand the invention than the applicant? Blue Cat Bios Council also said that the... He was talking about the embodiments, and he was saying, well, the reversing embodiment, it doesn't avoid contamination because that film that's left on the backside of the housing to the rear of the drain, that's undesirable liquid. It is undesirable liquid. It's undesirable because it came out of the microplate that was centrifuged, right? But he says it doesn't avoid contamination, so that means that their claim construction must be wrong because it's undesirable liquid, and it doesn't completely avoid contamination. But that's not what the specification says. The specification says we have embodiments where we do remove it all, and completely, it says completely avoid contamination. And we have other ones where we remove nearly all of it. They don't use the term nearly all, but that's the way it's been construed. And in those embodiments, it says greatly reduced, so we can either eliminate completely or greatly reduce. So that's an embodiment where it's been greatly reduced. And I should add here, too, that the board was very careful to say that they weren't reading into the claim a requirement that you avoid contamination. They didn't read that into the claim. They were reading the claim in the context of the specification in the prosecution history that it's an important aspect of the invention that you avoid contamination. That doesn't mean the claim says, you know, But it's important to keep in mind when you're reading those claims. A person of ordinary skill in the art, if they were reading those claims, they're going to read the specification. Maybe they should look at the prosecution history, too, under Phillips. But they're certainly going to read the specification, and they're going to see that avoiding contamination is emphasized. And again, something that you should keep in mind here is that Blue Cat Bio themselves, at Appendix 172, admitted that the patent emphasizes the importance of avoiding contamination. So you can't argue that a person of ordinary skill in the art is not going to reach the same conclusion. So does the board's construction exclude any of the embodiments that are disclosed in the patent? No. Let me clarify. The board's construction does not exclude any of the relevant embodiments. The patent discusses multiple embodiments. They have embodiments that we call the wind embodiments, where you are creating a gap between the rotor and the inner surface of the housing to generate a wind that will remove liquid that's expelled onto the inner surface. So there's three embodiments that we've identified that are disclosed in this patent that have this wind limitation, where what you're trying to do is basically clean the inner surface of the housing, like a self-cleaning device, almost. And the board's construction is consistent with all of those. And I should mention here... That's correct, Your Honor. And while we're here, I should also mention that none of those embodiments support BlueCat Bio's proposed construction. In none of those embodiments do you remove a de minimis amount of liquid from the wall. And is that, from your view, the real problem with BlueCat's proposed construction, is that it would allow just the removal of a small amount of water to still be within the scope of the claims. That's not the only reason. But that certainly is an important reason. What are some of the other problems with their construction? Well, another reason is that when you're construing claims, you start with the structure and language of the claims. And we have the independent claims 1 and 12. And they talk about how you have a rotor and you rotate the centrifuge and liquid from the microtiter plate that's in there will expel liquid onto the inner surface of the housing. And you have a gap. And the gap is such that you generate a wind that drives that liquid to the drain. Right? And so the structural language of the claim is it's driving the expelled liquid. Before it's saying liquid from the microtiter plate. And reading that, you see that what they're doing is they're saying you're driving the expelled liquid. And as noted by the... That modifies previous language that says cause liquid. Liquid. Right. It says liquid from the microtiter plate. And by the way, in the claim, it's in the context of a centrifuge for cleaning microtiter plates, which is where you remove all the liquid from. Or as much as you can get out from the microtiter plates. Okay? So when you're looking at that claim, you don't see anything like... You certainly don't see it say some or at least some. Right? So you have a problem with their construction just from the structural language. Doesn't say all. Doesn't say all either. Okay? But I think that... And then we get to the context also, reading it in the context of the patent prosecution. But then we have dependent claims 7 and 17, which are discussed quite a bit in the parties' briefs. And in those... So when you have a centrifuge, you run the rotor in one direction. Okay? And in this invention, the way they've constructed it, the rotation creates a wind in that direction. And so it's pushing the expelled liquid that's on the inner surface to the drain. And in claims 7 and 17, what you see is the patent calls for... After you've completed the centrifuging step in the independent claims, you reverse the direction of the rotation to remove a residual liquid film on the rear side of the drain. Okay? So now... Now we know, okay, so claims 7 and 17, they depend from the independent claims, and they're saying we have to reverse rotation to remove this liquid film, which means, okay, we have to accommodate the possibility that there's this liquid film on the rear side of the housing, you know, to the back of the drain, on the back side of the drain. And so now we know that claim 1 was not all. All right? But we also know, in context, that in the context of avoiding contamination, that this was all that was left. Okay? A person of ordinary skill in the art of reading this... It must have been all or most. I think even... I mean, it depends what you mean by most, right? And that's one of the problems we've had here, is that the patent talked about the main part, and we took the position that main part means the important part. Important in the context of avoiding contamination is removing nearly all. In other words, you could have this liquid film on the back side of the... you know, to the rear of the drain, on the inner surface of the housing, and so why, right? Well, BlueCatBio didn't present expert testimony on contamination. We engaged an expert specifically on biochemical assays and the problem of contamination to advise our mechanical engineering expert, who was a person of ordinary skill in the art. We're talking about a centrifuge, right? It's a mechanical device. So the person of ordinary skill in the art, and this is not disputed, was a mechanical engineer with a certain amount of experience who'd been informed about biochemical assays and the sensitivities of those. And that's what we presented. We presented Dr. Katz, who's a mechanical engineering professor at the Johns Hopkins University, and an expert on fluid mechanics drops, drops and things of that sort. And then we had another technical expert, Dr. Nissen, who is an expert in biochemical assays, and he explained in his declaration about problems relating to biochemical assays and contamination that Dr. Katz then, being a mechanical engineer and considering how the design of a centrifuge would take place, could opine then, okay, well, what's going on here? And Dr. Nissen testified that, well, in a biochemical assay, even one drop getting into, a drop from one well, these microtiter plates have multiple wells, typically, but a drop getting from one into another well of that plate or another well of a subsequent plate coming in is unacceptable. It'll ruin the test. And so Dr. Katz, who's a person of ordinary skill in the art, with an understanding now of the sensitivities of biochemical assays, concluded that the expelled liquid, that the wind has to be such that the expelled liquid is, either all or nearly all of the expelled liquid is removed by the wind, and that's what's required in the context of the claims and the patent. I think I'm out of time. So I'll wrap up here, but I'd like to thank the board. Thank you. Thank you, Your Honors. Dr. Rader has some rebuttal time, about three minutes. Yes, Judge Stark, you asked counsel whether the board's claim construction excludes the wind embodiments. So the question is, all or nearly all the board's construction, what does that mean? How much reduction in the possibility of cross-contamination is necessary? You just heard Mr. Shapiro say, even one single drop remaining, as their expert testified, and they've endorsed on page 56 of the Red Brief, even one single drop remaining in that housing disqualifies the device from satisfying the wind limitation. That means that those first two embodiments, the aspiration pump embodiment and the reversal embodiment, are excluded. They can't have it both ways. It can't be that one drop is too much, and these two embodiments that leave residual liquid behind, that's removed by wiping it down or by reversing it, somehow still satisfy the limitation. They can't have it both ways. The board applied its claim construction, as I said, it's like an onion. All or nearly all doesn't really tell you anything. The question is, how low does the risk of cross-contamination have to go for a device to satisfy this limitation? The only perhaps slightly more objective view that was ever offered is this patent talks about certain assays, cellular assays and ELISA assays, that the device can be used for. And the testimony was undisputed from Yagi-San. Counsel, isn't the issue here relating to Priorat, which is not being argued, but the Priorat device drove only a small amount of the liquid. And so you're arguing how much is how much, but you're not even close when the Priorat got rid of only a small amount. No, that's not correct, Your Honor. So a number of tests were done, but in the simplest test to talk about, so the device was run, there was a pipe from the bottom of the device down to a bucket, and 73% of the liquid that started in the microplate made it not just to the drain, but all the way through the pipe and to the bucket. So something north of 73%, since some of the liquid remained in the hose, an indeterminate amount, something north of 73% of that liquid went to the drain. And Yagi-San testified that his device is used for the very same assays that the patent describes, which their same expert, Dr. Nissen, said at one point, that's the touchstone. Is it good for those assays? Yagi-San testified it is. And there's independent corroboration of that in Micronix's 2010 patent application from before all of this, that that's what its device is used for. The bottom line, Your Honors, is they were faced with an examiner that disagreed, said that the wind limitation was broad, just like we say it is. They had the opportunity to amend their claim. They could have written whatever they wanted in their claim, all or nearly all, no cross-contamination, quantify it however they wanted to. They chose not to amend their claim. Instead, they're arguing a construction that excludes two of the three embodiments and I didn't have a chance to mention this, but the only embodiment it includes is the preferred embodiment with a gap of one millimeter or less. And we're not supposed to import limitations from a preferred embodiment. Thank you, Counselor. Thank you, Your Honors. We'll take the case under submission.